FILED
BILLINGS DIV.

IN THE UNITED STATES DISTRICT COURT

2008 NOV  6  PM 4 26

FOR THE DISTRICT OF MONTANA

PATRICK E. DUFFY, CLERK

BY _____
DEPUTY CLERK

BILLINGS DIVISION

| | |
|---|---|
| DECKER COAL COMPANY,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA;<br>UNITED STATES DEPARTMENT<br>OF THE INTERIOR; et al.,<br><br>    Defendants. | CV-07-126-BLG-RFC-CSO<br><br><br>**FINDINGS AND<br>RECOMMENDATIONS OF<br>UNITED STATES<br>MAGISTRATE JUDGE** |

Pending before the Court is Decker Coal Company's ("Decker's") appeal from the Interior Board of Land Appeals' ("IBLA's") decision affirming the Minerals Management Service's ("MMS's") determination that Decker owes additional royalties on certain coal sales. The Court heard oral argument from the parties on October 8, 2008. Having considered the parties' arguments, the administrative record, and the applicable law, the Court will recommend setting aside the IBLA's decision and entering judgment for Decker.[1]

---

[1]By Order dated February 26, 2008, Chief U.S. District Judge Cebull referred this case to the undersigned for all pretrial proceedings pursuant to 28 U.S.C. § 636, including submission of proposed findings and recommendations. *Court's Doc. No. 15.*

1

## I.      BACKGROUND

Between January 1, 1986 and January 1, 1988, Decker entered three
coal contracts with Big Horn Coal Company ("Big Horn") and one coal contract
with Black Butte Coal Company ("Black Butte"). *See Complaint for Judicial*
*Review of Administrative Action ("Complaint") (Court's Doc. No. 1), ¶11.* From
1986 through 1992, Decker sold coal to Big Horn and Black Butte pursuant to
these contracts ("the Montana Contracts"). The prices ranged from $7.30 to $9.70
per ton of coal. *Id., ¶¶12-13.*

Decker is a 50/50 Montana joint venture between KCP, Inc., a subsidiary of
the Kiewit Mining Group ("KMG"), and Western Minerals, Inc., a wholly-owned
subsidiary of NERCO Coal Corp., which in turn is a wholly owned subsidiary of
NERCO, Inc. ("NERCO"). Black Butte is a 50/50 Wyoming joint venture of
KMG and Bitter Creek Coal Company, a wholly-owned subsidiary of Union
Pacific Corporation. Big Horn is a Wyoming corporation, and a wholly-owned
subsidiary of KMG. *Id., ¶¶ 2, 6; Gov. Br. (Court's Doc. No. 26) at 2-3; Decker's*
*Br. (Court's Doc. No. 21) at 4.* KMG recognized the Montana Contracts as sales
to affiliates on its tax returns. *DC000086.*

In 1974, Decker entered a coal supply contract with Commonwealth Edison
Corporation ("ComEd") ("1974 Decker-ComEd contract"). This contract

provided a base price for 1974, and included price escalators that increased over time the base price of the coal Decker sold to ComEd. *Complaint., ¶¶36-37.* From 1985 through 1992, the base prices Decker received for its coal sales to ComEd under this contract were between $17.34 and $20.66 per ton according to the MMS's 2003 order, and $24.00 to $28.00 per ton according to Decker's complaint. *Id., ¶30; MMS Order, April 18, 2003, DC000076; DC000351.*

In 1976, Black Butte and Big Horn entered long term coal supply contracts with ComEd to supply coal to ComEd through the 1980's and 90's ("the Wyoming Contracts"). In the transactions at issue, Black Butte and Big Horn purchased coal from Decker under the Montana Contracts, and then sold that same coal to ComEd under the Wyoming Contracts at $25.00 to $31.72 per ton. *DC000351-52.* ComEd received the coal at Decker's mine, with Black Butte and Big Horn never taking physical possession. *Gov. Br. at 26, citing DC000686-87.* Importantly, however, it appears uncontroverted that Decker received no additional compensation when Black Butte and Big Horn resold the coal to ComEd. *Complaint, ¶45; Lang Aff., ¶6 (DC000097); Drummond Aff., ¶8 (DC000100).*

In 1992, the MMS issued an order assessing additional royalties on coal sold from 1986 to 1990 under the Montana Contracts. *DC000231.* Relying on factor (vi)("Such other relevant factors as the District Mining Supervisor may

3

deem appropriate"), under the version of 30 C.F.R. § 203.250(g)(2) effective in 1987, the MMS determined that the coal's value was not the $7.30 per ton Decker received under the Montana Contracts, but the significantly higher prices contained in the 1974 Decker-ComEd Contract. *DC000235-36.* Decker appealed this order.

On May 27, 1997, while Decker's appeal of the 1992 order was pending before the MMS, the MMS issued an order assessing additional royalties on coal sold under the Montana Contracts from 1991 to 1992. *DC000342.* The MMS applied benchmark (c)(2)(iv)(" other relevant matters") of the four regulatory benchmarks enacted in 1989 at 30 C.F.R. § 206.257©, finding again that the value of the coal for royalties purposes was the price paid under the 1974 Decker-ComEd contract. *DC000344.* Decker appealed from the 1997 order. The appeals from the 1992 and 1997 orders were consolidated.

In April 2003, MMS denied Decker's appeal and modified the 1992 order. *DC000348.* Regarding coal sold under the Montana Contracts prior to 1989, MMS, instead of relying on factor (vi) in the pre-1989 C.F.R., relied on factor (v) ("Prices reported to a public utility commission and/or the Federal Energy Regulatory Commission" ("FERC")). *DC000365.* Thus, MMS concluded that the $25-$31 per ton ComEd actually paid Black Butte and Big Horn for the coal under

4

the 1976 Wyoming Contracts was the appropriate value of the coal for royalties

assessment. *Id.* Regarding coal sold under the Montana Contracts after 1989,

MMS, instead of relying on benchmark (iv) under the 1989 regulation, relied on

benchmark (ii) ("Prices reported for that coal to a public utility commission"), and

again found that the prices ComEd paid under the 1976 Wyoming Contracts were

the appropriate measure of value for royalties assessment. *DC000369.* Decker

appealed this decision to the IBLA. *DC000003.*

MMS subsequently filed a motion to remand the case to the MMS Director

due to errors in the manner the 2003 decision applied the regulatory benchmarks.

*DC000269.* The IBLA granted the MMS's motion. *DC000531.* By decision

modification in January 2005, the MMS held that the appropriate benchmark for

valuation under the 1989 C.F.R. was (iv) rather than (ii), because the MMS had

discovered that ComEd was not required to report the prices paid for the coal at

issue to the relevant public utility commission. *DC000278.* Under benchmark

(iv), the MMS concluded that the value of the coal at issue for royalties purposes

was the price of the 1974 Decker-ComEd Contract. *DC000279.* The modified

decision did not directly address the pre-1989 regulations. Decker appealed the

modified decision to the IBLA. *DC000274.*

On July 17, 2007, the IBLA issued the decision Decker now appeals,

5

affirming the MMS's 2005 Decision. The IBLA first concluded that the Decker

Contracts were non-arm's length contracts under both the pre-1989 regulation and

the 1989 regulation. It next concluded that under the pre-1989 regulation the

MMS properly determined that the coal sold pursuant to the Decker Contracts

 "should be valued at what ComEd in fact paid for the coal." *172 IBLA 26*

*(Court's Doc. No. 1-3)*. Under the current regulation, the IBLA found that the

MMS "properly determined that the first applicable criterion was benchmark four

and, again, that royalty should be calculated on the prices ComEd actually paid to

Black Butte and Big Horn, Decker's affiliates, for the coal." *Id.*

## II.    ARGUMENTS

Though the parties' arguments are lengthy, the basic competing premises

are straightforward. According to Decker, it sold coal to Black Butte and Big

Horn under the Montana Contracts at rates near the high end of the prevailing

market prices for coal at the time. Thus, the transactions were legitimate, and the

royalties Decker paid were at or above what would have been paid if the coal were

sold to any other buyer on the open market in that time period. Again, it appears

uncontroverted that Decker received no additional compensation when Black

Butte and Big Horn resold the coal to ComEd. *Complaint, ¶45; Lang Aff., ¶6*

*(DC000097); Drummond Aff., ¶8 (DC000100)*.

6

According to the United States, Decker's sale of coal to Black Butte and Big Horn was a sham transaction to avoid paying royalties. Had Decker sold the coal directly to ComEd under the 1974 Decker-ComEd contract, the price would have been two or three times higher per ton. Instead Decker paid royalties on only $7.30 to $9.70 per ton in the sham "sale" to its affiliated entities, and ComEd picked up that coal at a significantly higher price with no additional royalties due from Decker.

## III.   LEGAL STANDARD

The Court reviews the IBLA decision under the Administrative Procedures Act. The Court engages in a limited review of IBLA decisions, and "will reverse only if the decision is arbitrary, capricious, not supported by substantial evidence, or contrary to law." Akootchook v. U.S., 271 F.3d 1160, 1164 (2001); see also 5 U.S.C. § 706. The Court's role is to "carefully search the entire record to determine whether it contains such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and whether it demonstrates that the decision was based on a consideration of the relevant factors." Id.

"An agency decision is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

7

runs counter to the evidence before the agency, or is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise.'"

Northwest Envt'l Defense Center v. Bonneville Power Admin., 477 F.3d 668, 687

(9th Cir. 2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.

Co., 463 U.S. 29, 43 (1983)).

To determine whether an IBLA decision rests on substantial evidence,

courts must "carefully search the entire record to determine whether it contains

'such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion' and whether it demonstrates that 'the decision was based on a

consideration of the relevant factors.'" Hjelvik v. Babbitt, 198 F.3d 1072 (9th Cir.

1999) (internal citations omitted).

Finally, courts "must give substantial deference to an agency's

interpretation of its own regulations." Akootchook, 271 F.3d at 1167.  Courts

"must defer to the agency's interpretation 'unless an alternative reading is

compelled by the regulation's plain language or by other indications of the

Secretary's intent at the time of the regulation's promulgation.'" Id. (quoting

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).  Thus, an agency's

interpretation "does not control where ... it is plainly inconsistent with the

regulation at issue." Friends of Southeast's Future v. Morrison, 153 F.3d 1059,

8

1069 (9th Cir. 1998).

## IV.  DISCUSSION

In its prayer for relief, Decker asks the Court to set aside the 2007 IBLA decision, and seeks a declaration that the decision is arbitrary and capricious, an abuse of discretion, not in accordance with law and unsupported by substantial evidence.  Although the IBLA decision is 26 pages, 24 pages are devoted to discussion of the background, procedural history and arguments of the parties. The IBLA devotes only one paragraph to analysis of the legal and evidentiary support for the MMS decisions on coal valuation.  That brief analysis relies heavily on a dissenting opinion in <u>Decker Coal Co. V. Department of Revenue</u>, 299 Mont. 477, 2 P.3d 245 (2000), a case involving state taxation, not federal royalties, albeit with similar valuation issues.  Because the IBLA affirmed the 2005 MMS decision with little additional analysis, the discussion below considers the law and evidence pertinent to the MMS decisions, under the standard of review set forth above.

For purposes of this discussion, the Court assumes that the Montana Contracts were not arm's-length transactions.  The sole question, then, is whether IBLA's determination of coal valuation for royalty purposes under the regulations applicable to non-arm's-length transactions withstands review.

9

Coal sold under federal coal leases is subject to royalties payable to the

United States. 30 C.F.R. § 206.253(a)(2002). The regulations specify how coal is

valued for royalty purposes. The transactions in question span 1986 through 1992.

Because the MMS issued new regulations in 1989, two sets of regulations are

relevant. These two regulations differ somewhat in form, but in substance are

quite similar.

### A.   Applicable Regulations

Coal sold under an arm's length transaction is valued at the gross proceeds

accruing to the lessee. 30 C.F.R. § 206.257(b)(1). If coal is not sold pursuant to

an arm's length transaction, the valuation for the years 1989 and beyond is based

on the first applicable regulatory benchmark set forth in 30 C.F.R. §

206.257(c)(2)(I-iv):

(I)   The gross proceeds accruing to the lessee pursuant to a sale under its
non-arm's-length contract (or other disposition of produced coal by
other than an arm's-length contract), provided that those gross
proceeds are within the range of the gross proceeds derived from, or
paid under, comparable arms length contracts between buyers and
sellers neither of whom is affiliated with the lessee for sales,
purchases, or other dispositions of like-quality coal produced in the
area. In evaluating the comparability of arm's length contracts for the
purposes of these regulations, the following factors shall be
considered: Price, time of execution, duration, market or markets
served, terms, quality of coal, quantity, and such other factors as may
be appropriate to reflect the value of the coal;

10

    (ii)    Prices reported for that coal to a public utility commission;

    (iii)   Prices reported for that coal to the Energy Information Administration of the Department of Energy;

    (iv)   Other relevant matters including, but not limited to, published or publicly available spot market prices, or information submitted by the lessee concerning circumstances unique to a particular lease operation or the saleability of certain types of coal.

The factors of the pre-1989 regulations apply in no specified order. The

pre-1989 regulation reads:

MMS shall determine the gross value of such coal taking into account:

    (I)    Any consideration received or paid by the operator/lessee in other related transactions.

    (ii)    The average price paid for coal of like quality produced from the same general area during the Federal lease month.

    (iii)   Contracts or other business arrangements, between coal producers and purchasers for the sale of coal other than coal produced under such Federal lease, which are comparable in terms, volume, time of execution, area of supply, and other circumstances.

    (iv)   Mining cost plus reasonable profit margin.

    (v)    Prices reported to a public utility commission and/or the Federal Energy Regulatory Commission.

    (vi)   Such other relevant factors as the District Mining Supervisor may deem appropriate.

30 C.F.R. § 203.250(g)(2)(1988).

## **B.     Regulation Interpretation By MMS and IBLA**

MMS's 2003 decision applied only factor (v) from the pre-1989 regulations,

the price ComEd actually paid for the coal and reported to a public utility

commission, that is, $25 to $31 a ton under its long-term Wyoming Contracts with

Black Butte and Big Horn. *DC000365*. As to the 1989 regulations, MMS relied

on benchmark (ii), the prices ComEd reported it paid to FERC and the state public

utility commission. *DC000369*.

In the 2005 modification of its 2003 decision, MMS acknowledged that it

erred in applying benchmark (ii) of the 1989 regulations, because ComEd was not

required to, and had not, reported prices for the coal at issue to the relevant public

utility commission. *DC000278*. MMS instead found the first applicable criterion

was (iv), the catch-all provision. It then determined that the 1974 Decker-ComEd

contract, which was "negotiated for the sale of significant quantities of the same

source coal, to the same ultimate purchaser, under contracts entered into in the

same time frame" was the best measure of the true value of the coal. *DC000332*.

The MMS rejected the numerous transactions provided in the expert report

offered by Decker, *A Report on the Market Price for Coal Sold By Decker Coal
Company to Big Horn and Black Butte Coal Companies Under Contracts
Executed From 1985-1988, by Dr. Robert L. Sansom, January 1993 ("*Sansom

12

report"), finding they were not comparable arm's length transactions. The
transactions were not comparable, according to MMS, because they were not
"encumbered" by conditional resale to ComEd , a provision present in the
Montana contracts. MMS also noted that the Decker contracts with Big Horn and
Black Butte limited the damages Decker could recover for any potential breach by
Big Horn or Black Butte. *DC000330-31.* Although the MMS states that "[t]erms
such as these would certainly affect the price of the coal", it provides no analysis
of how it would so affect the price, or whether the effect would tend to raise or
lower the selling price. The IBLA affirmed the MMS on these grounds. 174
IBLA 23-25 (*Court's Doc. No. 1-3*).

The 2005 MMS decision does not address valuation under the pre-1989
regulations. The pre-1989 regulation is only mentioned in a footnote. *See
DC00030, n. 5.* So it is puzzling that the IBLA purports to specifically affirm the
2005 MMS's determination under the pre-1989 regulations. *DC000582.* Adding
to the confusion is that the MMS's 2003 decision found that Decker had to pay
royalties under the pre-1989 regulations at the price of the Wyoming Contracts,
not the Decker/ComEd price.[2]  Apparently, what the IBLA thought it was doing

---

[2]The Wyoming Contract prices were several dollars per ton higher than the
1974 Decker-ComEd contract prices, the price imputed by MMS under the 1989
regulations which IBLA affirmed.

13

was affirming the 2005 MMS decision that royalty value must be based on the

Decker/ComEd price. But that is not what the IBLA said in its conclusion when it

indicated that the Wyoming Contract price was the proper price:

> We further conclude that under 30 C.F.R. § 203.250(g)[the pre-1989
> regulation], as applied by this Board, the Associate Director properly
> determined that the coal sold pursuant to the Decker Contracts should be
> valued at the ComEd in fact paid for the coal. Under the current regulation
> on valuing coal subject to a non-arm's length contract, 30 C.F.R. §
> 206.257(c)(2), the Associate Director properly determined that the first
> applicable criterion was benchmark four and, again, that royalty should be
> calculated on the prices ComEd actually paid to Black Butte and Big Horn,
> Decker's affiliates, for the coal.

172 IBLA 26, *DC000582*. Whether this error is accounted for by lack of care or

lack of understanding, it is indicative of lack of careful review by the IBLA of the

MMS decisions.

## C.  MMS and IBLA Misapplied the Regulations

The MMS's application of the regulations above, as affirmed by the IBLA,

is flawed. The MMS erred in applying the 1989 regulations by proceeding to

benchmark (iv) and then imputing a value solely from the 1974 Decker-ComEd

contract, which was far less similar to the Montana Contracts than the examples of

arm's-length contracts provided by Decker which the MMS rejected. The MMS

erred in applying the pre-1989 regulations by giving only one factor meaningful

14

consideration. Additionally, MMS's most recent conclusion under these
regulations in 2003 applies only factor (v) (prices reported to a public utility
commission), which MMS admitted was a mistake in the context of the 1989
regulations. Further, the IBLA's affirmance of the MMS in this respect fails to
correctly identify the factor MMS relied on in its decision.[3]

## 1.    1989 Regulations

MMS also erred in refusing to value the Montana Contracts coal under
benchmark (i) of the 1989 regulations. It is undisputed that MMS is to consider
the benchmarks in order and to value coal under the first applicable benchmark.
MMS declined to apply benchmark (i), as stated above, finding no other coal sales
were comparable.  Under benchmark (i), MMS "shall" consider the factors of
"[p]rice, time of execution, duration, market or markets served, terms, quality of
coal, quantity, and such other factors as may be appropriate to reflect the value of
the coal[.]" 30 C.F.R. § 206.257(c)(2)(i). MMS seized upon one factor in this list
– terms – and discounted the coal sales detailed in the Sansom report because
those sales were not "encumbered" by conditional resale to ComEd or Decker's
waiver of damage claims. MMS did not explain why the other factors in the list,

---

[3]The IBLA also mis-cites the pre-1989 regulation as 30 C.F.R. § 203.200(g) and
misquotes it by omitting entirely factor (v) and renumbering factor (vi) as factor (v). *See
172 IBLA 1, 6 n. 3 (DC000562).*

factors which appear to demonstrate comparability to the Montana Contracts, did

not serve to establish the value of coal from the region at the time despite a

difference in terms.

MMS disregards evidence of the arm's length coal sales detailed in the

Sansom report that indicate that the Montana Contracts were at or somewhat

above the market value for coal at the time.  The notice promulgating the 1989

regulations makes clear that evidence of market value, while not always solely

determinative, has real importance and thus should not be cursorily dismissed by

the agency as it was here:

> "Valuation has long been described as the process of
> determining the worth of, or setting a price upon,
> anything.  In the U.S. economic system, value has often
> been closely associated with market value. ... MMS
> accepts the principle that the most effective and efficient
> value-setting mechanism is the value set by competition
> in the free market."

54 Fed. Reg. 1492, 1493 (Jan. 13, 1989).

The importance of Decker's evidence of market value for coal at the time is

confirmed by case law as well.  See e.g. Fina Oil &Chemical Co. v. Norton, 332

F.3d 672, 678-79 (D.C.Cir. 2003) ("Fina must pay royalties based on the actual

market value of the gas at the time Fina transfers the gas to its affiliate" pursuant

to a non-arm's length sale.); Mobile Oil Corp., 112 IBLA 198, 205 (Dec. 13,

1989) (MMS will normally accept non-arm's length contract price for royalties

valuation of natural gas where "the lessee can show that the contract has

characteristics similar to arm's length contracts which represent fair market

value[.]"). The IBLA has held that oil should be valued, for royalties purposes, at

a non-arm's length contract price which is a fair market price. Getty Oil Co., 51

IBLA 47, 51 (Oct. 31, 1980).

> Although contracts between a parent corporation and its
> subsidiary may not be at arm's length, they may result in
> a fair market price. If a transaction is not at arm's
> length, some other manifestation that the price is
> nonetheless an accurate portrayal of the article's worth is
> required. It must be a price which independent buyers in
> arm's length transactions would be willing to pay.

Id.

Again, the regulation directs MMS to consider the first applicable

benchmark. MMS's cursory dismissal of benchmark (i) on the basis of one factor

in the list, terms, when the regulations direct that MMS "shall consider" all

factors, was erroneous and contrary to the plain language of the regulation.

Indeed, the "encumbrance" in the Montana Contracts arguably would tend to raise

the coal's value because the buyers accepted no risk and the seller waived a right

to damage claims. And, according to the evidence before the MMS, the Montana

Contracts contained some of the highest coal prices in the region within that time

frame.

MMS then compounds its error by proceeding to benchmark (iv), the catchall provision in the 1989 regulations, and relying exclusively on the 1974 Decker-ComEd contract to impute value to the coal sold under the Montana Contracts. The 1974 Decker-ComEd contract is less similar to the Montana Contracts than the transactions reported by Sansom, which the agency rejected. The MMS states, and IBLA affirmed, that the Decker/ComEd prices "represent the base measure of value because they were negotiated for the sale of significant quantities of the same source coal, to the same ultimate purchaser, under contracts entered into in the same time frame." *DC000572.* But they were not entered into in the same time frame. Clearly contrary to the MMS's finding is the fact that the 1974 Decker-ComEd contract was executed twelve years prior to the Montana contracts. The Decker-ComEd contract was for a longer term, and included price escalators not found in the Montana Contracts. The evidence before the MMS indicated that market conditions were far different when the 1974 contract was negotiated than in the time period under review. Finally, the encumbrances in the Montana Contracts that the agency found to differentiate the contract examples in the Sansom report under benchmark (I) are not present in the 1974 Decker-ComEd contract either.

Additionally, under benchmark (iv), relevant factors for agency consideration include spot market prices. The Sansom report provides several examples of spot market coal prices from the Powder River Basin. *See DC000221*. The final MMS and IBLA decisions apply benchmark (iv) without a considered analysis of spot market pricing, or any meaningful discussion as to why this, the only specifically enumerated factor under benchmark (iv), was inapplicable or unreliable in this instance. *DC000279; DC000581-82*.

For these reasons, the Court concludes the IBLA finding that the 1974 Decker-ComEd contract prices were the best measure of value for royalties on coal sold under the Montana Contracts is arbitrary, capricious, contrary to the regulations, and unsupported by substantial evidence. The regulations at issue, and the relevant case law, do not allow MMS to ignore evidence – in the form of contemporaneous arm's-length contracts and spot market prices, that Decker received prices at or above market value in the Montana Contracts – and then rely exclusively on a long-term supply contract entered twelve years earlier, with very different terms, to value coal for royalties assessment.

## 2. Pre-1989 Regulations

The MMS's application of the pre-1989 regulations, as affirmed by the IBLA, also should be set aside. First, as set forth above, the MMS's 2005

19

modification, which the IBLA affirmed, makes no finding under the pre-1989 regulations as to why the 1974 Decker-ComEd contract prices should govern. Thus, the MMS's decision which the IBLA affirmed arguably is the 2003 decision which valued Decker's coal at the prices ComEd paid Black Butte and Big Horn under the Wyoming Contracts. The IBLA's decision, as stated in its conclusion, indicates that the IBLA was in fact affirming MMS's 2003 decision. "[U]nder [the pre-1989 regulations] as applied by this Board, the Associate Director properly determined that the coal sold pursuant to the [Montana] Contracts should be valued at what ComEd in fact paid for the coal." *DC000582; see also DC000579.* Necessarily, this would mean that the coal sold under the Montana Contracts prior to 1989 would be valued, for royalties, according to the Wyoming Contract prices, and coal sold under the Montana Contracts after the 1989 regulations took effect would be valued according to the 1974 Decker-ComEd contract. This result is not that contemplated by the parties, or, apparently, by the IBLA itself.

As noted above, the IBLA also failed to correctly identify the basis for the MMS decision it was affirming. In 2003, MMS first determined that the Montana Contract prices did not govern because Decker had failed to show independent indicia that the contract prices reflected the fair market value of production. *DC000364.* MMS then rejected MRM's position that the 1974 Decker-ComEd

prices should determine value under factor (vi), and adopted the prices of the

Wyoming Contracts under factor (v), prices reported to FERC and the State public

utility commission. *DC000365.* As previously stated, the MMS's 2005

modification provided no analysis of the pre-1989 regulations, but did concede

that prices reported to FERC and the State public utility commission were not

applicable in this case. *DC000278.*

Even if the Court assumes that the MMS, by implication in the 2005

modification, shifted its rationale from factor (v) to the catch-all factor (vi), the

IBLA and MMS misapplied the pre-1989 regulations. 30 C.F.R. § 203.250(g)

clearly states "MMS shall determine the gross value of such coal taking into

account ..." and then lists six factors. The word shall "indicates a mandatory duty

that is not subject to discretion." Sacks v. Office of Foreign Assets Control, 466

F.3d 764, 778 (9th Cir. 2006). Thus, the plain language of the regulation requires

MMS and IBLA to consider all factors listed. Contrary to the Government's

argument here, Lone Star Steel Co., 117 IBLA 96 (1991) also requires MMS to

consider all specifically enumerated factors, though only those factors which are

relevant need form the basis for the valuation. "[T]he discretion manifested in the

MMS Director by the relevant regulation in this case is confirmed by the direction

to consider 'other relevant matters' in addition to those factors specifically

enumerated." Id. at 105. Lone Star does not allow MMS to rely solely on factor
(vi) of the pre-1989 regulations, other relevant matters, without at least
considering the enumerated factors and giving a logical reason why those factors
are not relevant. See Id. at 104. The MMS and IBLA erred by failing to consider
the enumerated factors in the pre-1989 regulations before relying solely on prices
from the Wyoming Contracts.

Of concern to the Court is the illogical, shifting and seemingly inconsistent
bases for the MMS and IBLA conclusions. The Court concludes that the IBLA's
affirmance of the MMS's decision regarding royalties due under both the pre-1989
regulations and the 1989 regulations is arbitrary, capricious, contrary to law, and
unsupported by substantial evidence.

## V.   CONCLUSION

Based on the foregoing, IT IS RECOMMENDED that the IBLA's 2007
decision here appealed should be set aside and judgment be entered for Decker.
The Court thus need not address Decker's remaining arguments.

DATED this 6th day of November, 2008.

Carolyn S. Ostby
United States Magistrate Judge

22